RECEIVED
IN ALEXANDRIA, LA

APR 2 1 2006

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

NORMAL PARM Jr., et al       CIVIL ACTION 3-01-2624

VERSUS       U.S. DISTRICT JUDGE ROBERT G. JAMES

MARK W. SHUMATE, IN HIS       U.S. MAGISTRATE JUDGE JAMES D. KIRK
OFFICIAL CAPACITY AS SHERIFF
OF EAST CARROLL PARISH

SECOND REPORT AND RECOMMENDATION

Before the court is a motion for partial summary judgment by plaintiffs [**Doc. #5**] and

defendant's cross motion for summary judgment and alternative motion for abstention [**Doc. #11**],

both of which are referred to me by the district judge for Report and Recommendation.

This is a suit for declaratory judgment, injunctive relief and for damages under the Civil

Rights Act and Louisiana state law. Plaintiffs sue the sheriff of East Carroll Parish in his official

capacity only, claiming in a complaint verified by all of the plaintiffs, that the plaintiffs have in the

past, and desire in the future, to navigate over, and fish and hunt on, the waters of the Mississippi

River, and in areas claimed to be owned by Walker Lands, Inc. (Walker Lands), including Gassoway

Lake, Little Gassoway Lake, Bunch's Cutoff, Old River, "the old channel", "and other miscellaneous

and unnamed navigable water areas comprising a portion of the Mississippi River during normal

water heights." Normal Parm, Jr., Harold Eugene Watts, Roy Michael Gammill, William T. Rogers

and Robert Allen Balch (plaintiffs) claim they are fishermen, hunters and outdoorsmen.

Jurisdiction is founded by plaintiffs on the Civil Rights Act, 42 U. S. C. § 1983 et seq., and

the Federal navigation laws found in 33 U.S.C. § 10, et seq., and applicable regulations, 33 C.F.R.

§ 329.4, the "Federal Navigational Servitude," the Rivers and Harbors Appropriation Act of 1899, and pendant jurisdiction as to the claims founded on state law.

By first Report and Recommendation [Doc. # 22], I found both Pullman type abstention and Colorado River abstention to be applicable and recommended that this case be stayed pending the outcome of state court litigation in <u>Walker Lands, Inc. and Hollybrook Land Company, Inc. v. East Carroll Parish Police Jury and State of Louisiana</u>, Civil action number 17, 746, Sixth Judicial District Court, Parish of East Carroll, Louisiana (the Walker Lands case). That case involved allegations as to the ownership of the areas in dispute here as well as questions of navigability. It was anticipated that the case would answer at least some of the issues presented here. U. S. District Judge Robert G. James ordered this case stayed in October 2002 [Doc. #27] and the Fifth U. S. Circuit Court of Appeals affirmed the ruling based on Pullman type abstention [Doc. #32].[1]

The state court's decision in the Walker Lands case became final after the Louisiana Second Circuit Court of Appeals ruled on April 14, 2004, at 871 So.2d 258 (2d Cir. 2004) and the state Supreme Court denied the sheriff's writ application in June of 2005, at 903 So. 2d 442 (La. 2004). This court then reopened these proceedings. Following delays caused to some of the attorneys by Hurricane Katrina, all briefs were filed by December 28, 2005. Permission to file an amicus curiae brief was granted to the Waterways Access Association, a non-profit Louisiana corporation whose stated purpose is, among other things, "to protect the citizen's (sic) right to access navigable waterways and the natural overflow; to insure the continuation of the hunting and fishing heritage and other outdoor recreational opportunities of the citizens of the community, region and state...".[2]

---

[1] <u>Parm v. Shumate</u>, 73 Fed. Appx. 78 (5th C. 2003).

[2] See complaint, Doc. #1, paragraph II., in <u>Waterways Access Association v. Walker Lands, Inc. and Hollybrook Land Co., Inc.</u>, docket number 99 cv 1750 on the docket of this court.

Some, but not all, of the plaintiffs are members of that association, and that association is plaintiff in a related case pending in this court (see footnote 2) which remains stayed. An amicus curiae brief by Walker Lands was also allowed filed.[3]

Plaintiffs, in their motion for summary judgment, ask this court to find the sheriff lacks probable cause to arrest the plaintiffs for trespass under La. R. S. 14:63 while they are on the waters of the Mississippi river, declaring that the sheriff lacks sufficient evidence to support a verdict of guilty beyond a reasonable doubt that plaintiffs are guilty of trespass, and granting a permanent injunction against the sheriff enjoining him from arresting the plaintiffs and other persons while on the disputed area.

The sheriff, in his cross motion, asks that plaintiffs' claims be dismissed and asserts the defense of qualified immunity.

The Law of Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure mandates that a summary judgment:

"shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, [submitted concerning the motion for summary judgment], if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Paragraph (e) of Rule 56 also provides the following:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."

---

[3] Walker Lands has filed evidence attached to its amicus brief. A person granted special amicus status may file a brief as allowed by this court's order but may not submit evidence. It is not a party to this case. Therefore, the attachments will not be considered and have been ordered stricken from the record.

Local Rule 56.2W also provides that all material facts set forth in a statement of undisputed facts submitted by the moving party will be deemed admitted for purposes of a motion for summary judgment unless the opposing party controverts those facts by filing a short and concise statement of material facts as to which that party contends there exists a genuine issue to be tried. Since plaintiff has not attempted to controvert any of the specific facts stated in the defendant's statement of undisputed facts, those facts will be deemed admitted for purposes of this motion.

A party seeking summary judgment always bears the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 106 S.Ct. 2548 at 2552; International Ass'n. of Machinists & Aerospace Workers, Lodge No. 2504 v. Intercontinental Mfg. Co., Inc., 812 F.2d 219, 222 (5th Cir. 1987). However, movant need not negate the elements of the nonmovant's case. Litttle v. Liquid Air Corporation, 37 F.3d 1069 (5th Cir. 1994). Once this burden has been met, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." Izen v. Catalina 382 F.3d 566 (5th Cir. 2004); Fed. R. Civ. P. 56(e). All evidence must be considered, but the court does not make credibility determinations. If the movant fails to meet its initial burden, summary judgment should be denied. Little, 37 F.3d at 1075.

However, the non-movant, to avoid summary judgment as to an issue on which it would bear the burden of proof at trial, may not rest on the allegations of its pleadings but must come forward with proper summary judgment evidence sufficient to sustain a verdict in its favor on that issue. Austin v. Will-Burt Company, 361 F. 3d 862, (5th Cir. 2004). This burden is not satisfied with "some metaphysical doubt as to the material facts," by "conclusory allegations," by "unsubstantiated

4

assertions," or by only a "scintilla" of evidence. <u>Little</u>, id.

In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." <u>Celotex</u> at 2553.

## BACKGROUND

The case before the Louisiana Second Circuit Court of Appeal was Walker Lands' case filed against the East Carroll Parish Police Jury to stop all public use of Gassoway Lake and a drainage ditch which runs from the southern end of Gassoway Lake to Bunch's Cutoff, a large body of water that connects, at least on its southern end, with the Mississippi River. See Exhibit A, a topographic map of the disputed area. [4] The State of Louisiana was added to the case as an indispensable party. The State answered claiming ownership or, alternatively, a servitude on the disputed lands. Walker Lands also claimed ownership.

The Louisiana court of appeal affirmed the trial court's finding that Gassoway Lake was formed when the Mississippi first moved westward in the 1860's and 1870's and then slowly moved back eastward and formed Gassoway Lake at least by 1894. The court found that the lake and the lands between it and the Mississippi River were formed by accretion which deposited alluvion as the Mississippi moved back eastward. The court ruled that Walker Lands owns Gassoway Lake, the drainage ditch and the surrounding lands to the Mississippi River. The court reversed the trial court's granting of an injunction prohibiting the public's use of the waters.

In its opinion, the court observed that at this point in its course, the Mississippi River's

_____

[4] The map is Plaintiff's Exhibit 8(a) published by the United States Geological survey (1994). The exhibit was originally filed as Exhibit 6(a) but, along with Exhibit 6, was renumbered when it was discovered that there was already an Exhibit 6.

ordinary low water mark is 77 feet and its high water mark is 112 feet. The court noted that the Mississippi River levee sits at the western side of Gassoway lake. The channel of the Mississippi River is approximately three and a half miles east of Gassoway Lake. The court further found as a fact that "Gassoway Lake remains landlocked during most of the year and is practically inaccessible by boat." The court also found that at low water (77 feet) the ditch is "mostly dry" but at the high water mark, the waters of the Mississippi submerge all[5] of the lands in dispute, including Gassoway Lake, all the way to the levee on the west side of the lake.

The state court refused to enjoin the public at large from using the lands, finding no legal authority authorizing such action. The court also pretermitted ruling on the existence of legal servitudes on the property, finding that there was no justiciable controversy as between the State and Walker Lands on that issue.

The dispute comes to this court, then, as one to determine plaintiffs' rights to go upon the waters when they cover all or part of the Walker lands.[6] In brief, plaintiffs define the issue as follows:

> "The plaintiffs are seeking a declaratory judgment that they have the right to navigate along the irregular shore of the Mississippi River, notwithstanding who might own the bank and shore of the mighty Mississippi River. [7]

---

[5]  The topographic map in evidence in this proceeding shows that the elevation in a few places on the lands is higher than 112 feet. At oral argument counsel for plaintiffs suggested, in answer to the court's inquiry, that approximately 95% of the lands are under water at the high water mark of 112 feet. That suggestion appears consistent with the topographic map.

[6]  From this point on in this opinion, "the Walker lands" will refer to the land as well as Gassoway lake and the other water bodies on the land, including, without limitation, Gassoway Lake, "the drainage ditch", Little Gassoway Lake, Bunch's Cutoff (to the extent it lies within the State of Louisiana), and Doe Lake.

[7]  Plaintiffs' brief, Doc. #5, p. 5.

"There is one fundamental legal dispute in this case that will resolve this case either in favor of Plaintiffs and public use of the entire navigable and fishable Mississippi River or not. The legal dispute is whether the public, including the Plaintiffs, have the federal right or state right to navigate, fish and hunt, and otherwise exploit, enjoy and utilize the full water surface of the Mississippi river at its normal water heights."[8]

It is clear from plaintiffs' complaint and from their multiple briefs that plaintiffs seek to navigate on and to fish and hunt on water between the ordinary low water mark and the ordinary high water mark of the Mississippi River. They do not seek authority to go upon dry land belonging to Walker Lands or others and do not seek to go upon waters which flood lands when the Mississippi rises above its ordinary high water mark of 112 feet.

The topographic map in evidence shows that the normal elevation of Gassoway Lake is 95 feet.

## ANALYSIS

A Preliminary Procedural Matter

Defendant argues that this case is moot because plaintiffs' complaint and their briefs assert entitlement to relief only "until the Second Circuit rules". Had this court interpreted plaintiffs' claims to be so limited, there would have been no need to abstain and to stay this case until the state courts had issued a final ruling. Plaintiffs' complaint anticipated that the state courts might decide the issues presented here. For example, in paragraph 28 plaintiffs assert that they "desire that this Honorable Court grant a declaratory judgment that until the Judgment of March 5, 1999, of the Second Circuit Court of Appeals is reversed, modified or a subsequent final judgment is rendered by a court of competent jurisdiction, specifying the ownership and navigational rights of the State of Louisiana and Walker Lands, Inc. ...there is not sufficient evidence to support a verdict of guilty...". See, to the

---

[8] Plaintiffs' brief, Doc. #55, p. 2.

same effect, paragraph 29. In addition, the prayer of the complaint in paragraph 2 asserts entitlement to relief until a court specifies the navigational rights of the persons in interest. As pointed out above, the Second Circuit expressly pretermitted ruling on the issue of navigational rights. No other court has decided the issue. Therefore plaintiffs' claims are not moot and have been adequately pled.

Plaintiffs' Rights To Go Upon The Disputed Waters

Plaintiffs claim that, in the past, they have each been arrested or threatened with arrest for violating Louisiana's trespass laws if they go upon the water when it covers the Walker lands. This court accepts, as it must,[9] the finding of the state courts that Walker Lands owns the lands under discussion here. However, ownership is irrelevant to this proceeding, for Louisiana law provides a remedy for trespass even to one who is only a possessor of property. Manzanares v. Meche, 506 So. 2d 957 (La. App. 3rd C. 1987), writ den. 508 So.2d 822 (1987). The issue is whether plaintiffs have a right to go upon the waters covering the Walker lands, regardless who owns them.

Plaintiffs seek a declaratory judgment and injunction recognizing their asserted rights to go upon the waters of the Mississippi river between its ordinary low water stage and its ordinary high water stage to navigate, fish and hunt. Plaintiffs claim these rights are granted by federal law, specifically the Federal navigational servitude, and by Louisiana state law.

a) Plaintiffs' Rights under Federal Statutes and The Federal Navigational Servitude

When Louisiana was admitted to the Union, on equal footing with the original thirteen states, Louisiana received ownership of all navigable waters within its borders and all tide waters and the lands under them from the United States in public trust.[10] See Phillips Petroleum Co. v. Mississippi,

---

[9] Harper Macleod Solicitors v. Keaty & Keaty, 260 F.3d 389 (5th C. 2001).

[10] However the federal common law public trust doctrine probably does not provide this court with subject matter jurisdiction. State of New York v. DeLyser, 759 F. Supp. 982 (W.D.

108 S. Ct. 791 (1988); Dardar v. Lafourche Realty Co., Inc., 985 F.2d 824 (5th C. 1993). A condition of its admission was that the Mississippi river and all navigable rivers and waters leading into it "shall be common highways and forever free..." Act of Congress February 20, 1811, 2 U. S. Stats. 641, Act of Congress April 8, 1812, 2 U. S. Stats. 701. Current law provides that "[a]ll the navigable rivers and waters in the former Territories of Orleans and Louisiana shall be and forever remain public highways." 33 U.S.C. § 10. In The Daniel Ball, 77 U.S. 557, 19 L. Ed. 999 (1870), the Supreme Court said: "Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water." See also 16 U.S.C. § 796. This court takes judicial notice that the Mississippi River was navigable in 1812 and remains so today. See State of Arizona v. State of California, 51 S. Ct. 522 (1931). The parties do not dispute the navigability of the Mississippi River.

     i) Federal Statutes

     Plaintiffs argue that their asserted right to navigate on and to fish and hunt on waters of the Mississippi is recognized by the Federal navigation statutes and is also a "subset" of the Federal navigational servitude.

---

New York 1991).

9

The Federal navigation statutes are found in 33 U.S.C. § 1, et seq. Plaintiff points specifically to 33 U.S.C. § 10 which provides:

> "All the navigable waters in the former Territories of Orleans and Louisiana shall be and forever remain public highways."

This provision codifies the Act of Feb. 20, 1811, mentioned above.

While the obvious intent of this provision is to ensure the public's right to navigate on the navigable waters, the extent of those rights is not set forth in the statute or in other Federal statutes we have found or to which we have been referred by counsel. Unquestionably, the Federal government may, pursuant to the Commerce Clause, constitutionally regulate the extent of those rights and it has chosen to do so to some extent as will be discussed below. Similarly, Louisiana retains the right to regulate such bodies within its borders pursuant to its ownership of the water bottoms obtained upon its admission to the Union. The fact that the navigable waters, including the Mississippi, shall remain a public highway, however, does not preempt Louisiana's power to regulate them. Cummings v. City of Chicago, 23 S. Ct. 472 (1903); Wood Marine Service, Inc. v. City of Harahan 858 F.2d 1061 (5th C. 1988). Louisiana, too, has chosen to regulate its navigable waters as will also be discussed below. However, I do not find that 33 U.S.C. § 10 grants to plaintiffs the right to fish or hunt on navigable waters in Louisiana nor does it, standing alone, define the extent of the plaintiffs' rights to use the waters as a public highway. For that we must look to other state and federal laws, as will be discussed.

ii) The Federal Navigational Servitude

In general, all persons have the right to use open navigable waters. Gibbons v. Ogden, 6 L. Ed. 23 (1824); Gray v. Bartlett, 37 Mass. (20 Pick.) 186 (1838). The public right of navigation "entitles the public generally to the reasonable use of navigable waters for all legitimate purposes

10

of travel or transportation, for boating or sailing for pleasure, as well as for carrying persons or property for hire, and in any kind of water craft the use of which is consistent with others also enjoying the right possessed in common." Silver Springs Paradise Co. v. Ray, 50 F.2d 356 (5th C. 1931) [so-called old Fifth Circuit]. However, certain otherwise navigable waters located on private property and constructed with private funds are nevertheless not subject to public use. See, e.g. Kaiser Aetna v. United States, 100 S. Ct. 383 (1979); Vaughn v. Vermillion Corporation, 100 S. Ct. 399 (1979). While it has been implied that the right of the public to use certain navigable waters depends upon the existence of the federal navigational servitude,[11] the Federal navigational servitude does not define the parties' rights to use the navigable waters, but is more "an expression of the notion that the determination whether a [eminent domain] taking has occurred must take into consideration the important public interest in the flow of interstate waters that in their natural condition are in fact capable of supporting public navigation." Kaiser Aetna v. United States, 100 S. Ct. 383 (1979).

Early in our nation's history our Supreme Court held that the power to regulate commerce necessarily includes power over navigation. Gibbons v. Ogden, 6 L. Ed 23 (1824). In United States v. Rands, 88 S. Ct. 265 (1967) the Court observed:

> "The Commerce Clause confers a unique position upon the Government in connection with navigable waters. 'The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States. For this purpose they are the public property of the nation, and subject to all the requisite legislation by Congress.' Gilman v. City of Philadelphia,

---

[11] In Dardar v. Lafourche Realty Co., Inc., 985 F.2d 824 (5th Cir. 1993), the court of appeal had before it a suit by commercial fishermen seeking recognition of their right to fish upon waters they claimed were navigable. The court remanded the case for a determination whether a federal navigational servitude existed on some of the waters at issue and thus did not reach the issue of plaintiffs' asserted rights to fish in the waters. See also, United States v. Harrell, 926 F.2d 1036 at 1040 (11th C. 1991).

3 Wall. 713, 724-725, 18 L. Ed 96 (1866). This power to regulate navigation confers upon the United States a 'dominant servitude' FPC v. Niagra Mohawk Power Corp., 347 U.S. 239, 249, 74 S. Ct. 487, 493, 98 L.Ed 6886 (1954), where extends to the entire stream and the stream bed below ordinary high water mark." (Emphasis added).

See also, <u>United States v. Cherokee Nation of Oklahoma</u>, 107 S. Ct. 1487, 1490 (1987); <u>United Texas Transmission Company v. United States Army Corps of Engineers</u>, 7 F. 3d 436 (5ᵗʰ Cir. 1993); <u>United States v. 119.67 Acres of Land</u>, 663 F.2d 1328 (5ᵗʰ Cir. 1981).

The comprehensive nature of Congress' regulatory authority over national waters was more fully described in <u>United States v. Appalachian Power Co.</u>, 61 S. Ct. 291 (1940) at 308:

"[I]t cannot properly be said that the constitutional power of the United States over its waters is limited to control for navigation. . . . In truth the authority of the United States is the regulation of commerce on its waters. Navigability . . . is but a part of this whole. Flood protection, watershed development, recovery of the cost of improvements through utilization of power are likewise parts of commerce control. . . .[The] authority is as broad as the needs of commerce. . . . The point is that navigable waters are subject to national planning and control in the broad regulation of commerce granted to the Federal Government." See also <u>Kaiser Aetna et al v. United States</u>, 100 S. Ct. 383 (1979).

From the Federal government's power to control all navigable waters of the United States comes the dominant "navigational servitude" which extends to all areas below the ordinary high water mark. <u>Cherokee Nation of Oklahoma, 107 S. Ct. 1487 (1987); United States v. 119.67 Acres of Land</u>, 663 F.2d 1328 (5ᵗʰ C. 1981); <u>United Texas Transmission Company v. United States Army Corp of Engineers</u>, 7 F.3d 436 (5ᵗʰ C. 1993).

Federal law defines high water mark differently than does Louisiana law.[12] "Ordinary high water mark is defined in 33 C.F.R. § 329.11, concerning the jurisdiction of the Army Corp of Engineers, to be "the" line on the shore established by the fluctuations of water and indicated by physical characteristics such as a clear, natural line impressed on the bank; shelving; changes in the

---

[12] See p. 16.

character of the soil; destruction of terrestrial vegetation; the presence of litter and debris; or other appropriate means that consider the characteristics of the surrounding areas." In <u>Goose Creek Hunting Club, Inc. v. United States</u>, 518 Fed 2d 579 (Ct. Cl. 1975), the court noted that "[j]udicial decisions indicate that the ordinary high-water mark can be variously defined–e.g., as the line where the water stands sufficiently long to destroy vegetation below it (<u>Kelley's Creek and Northwestern R.R. v. United States, 100 Ct. Cl. 396, 406 (1943)</u>); or as the line below which the soil is so usually covered by water that it is wrested from vegetation and its value for agricultural purposes destroyed (<u>Harrison v. Fite</u>, 148 F. 781, 783 (8th C. 1906)); or as the line below which the waters have so visibly asserted their dominion that terrestrial plant life ceases to grow and, therefore, the value for agricultural purposes is destroyed (<u>Borough of Ford City v. United States</u>, 345 F.2d 645, 648 (3rd C. 1965), cert. denied, 382 U.S 902, 86 S. Ct. 236, 15 L.Ed2d 156 (1965)); or as the line below which the soil is kept bare of vegetation by the wash of the waters of the river from year to year in their onward course (<u>State of Oklahoma v. State of Texas</u>, 260 U. S. 606, 632, 43 S. Ct. 221, 67 L.Ed.2d 428 (1923))."[13]

Unquestionably, the rights of the United States extend to the Constitutional purposes of commerce, navigation (including the navigational servitude), national defense, and international affairs. 43 U. S. C. 1314 (Submerged Lands Act). The navigational servitude "is an extremely old concept–owners of property or property rights *within navigable waters* take those rights fully cognizant of their limited nature." <u>Coastal Petroleum Co. v. United States</u>, 524 F.2d 1206, 1209 (5th Cir. 1975) and cases cited therein.

Despite these observations on the wide reach of the Federal government when it comes to

---

[13] Compare, as to tidelands, <u>Borax Consolidated, Ltd. v. City of Los Angeles</u>, 56 S. Ct. 23 (1935).

regulating navigable waters for commerce, navigation, national defense and international affairs, I have found no authority, and plaintiffs have directed the court to none, for the proposition espoused by plaintiffs that the Federal navigational servitude operates to grant persons the right to fish or hunt on navigable waters. Once again, the Federal navigational servitude is only "an expression of the notion that the determination whether a taking has occurred must take into consideration the important public interest in the flow of interstate waters that in their natural condition are in fact capable of supporting public navigation." Kaiser, supra.

Therefore, I find that the Federal navigational servitude does not provide plaintiffs with the right to fish or hunt on the Mississippi River.

However, I find that, because the Mississippi river is a navigable waterway, there is a federal common law right of navigation which includes the right to reasonably use the Mississippi's waters for the purposes, among other things, of navigation including travel and transportation, commerce, boating, sailing, and fishing and hunting from boats. See Gibbons, supra; Silver Springs Paradise Co., supra. These rights apply laterally across the entire surface of the river [33 U.S.C. 1, 3; 33 CFR §329.4 (1978)] to the high water mark.[14]

Walker Lands cites Zunamon & Chicago Mill & Lumber Co. v. U.S., 221 Ct. Cl. 835 (Ct. Cl. 1979) which in turn cites Goose Creek Hunting Club, Inc. v. United States, 518 F.2d 579 ( Ct. Cl. 1975), and United States v. Harrell, 926 F.2d 1036 (11th Cir. 1991), in support of its argument that the subject waters are not navigable and thus not subject to public use. However, in Zunamon, the court was unable to determine whether or not the disputed area was within the bed (as defined by Federal law which includes the "bank"). In Goose Creek, the court found that the area in dispute

---

[14] As defined by Federal law.

was outside the ordinary high water mark of the river and thus not subject to government use without compensation. Likewise, in Harrell, the court held that the government's navigational servitude did not extend past the high water mark. The reasoning of all three cases is consistent with the analysis here.

      b) Plaintiffs' Rights Under Louisiana Law

          i) Legal precepts

In Louisiana, ownership of things is dependent on their designation as common, public or private. La. CC Art. 448. Public things are owned by the State and include running waters and the waters and bottoms of natural navigable water bodies, the territorial sea and the seashore. La. CC Art. 450. Public things are subject to public use, laws and regulations. La. CC. Art 452. Private things are owned by individuals but may be subject to public use. La. CC Arts. 453, 455.

A river consists of three things: the running water, the bed, and the banks. Yiannopoulos, Louisiana Civil Law Treatise, Property, 3rd Ed., Ch.5, §84; State v. Richardson, 72 So. 984 (1916). The waters are a public thing. La. CC Art. 450; La. R.S. 9:1101. Likewise, the bed of the river below the mean low watermark is a public thing. Yiannopoulos, Louisiana Civil Law Treatise, Property, 3rd Ed., Ch.4, §74; Wemple v. Eastham, 150 La. 247, 90 So. 637 (1922). The water and the bed are public things which may not be privately owned. Mayor of New Orleans v. Metzinger, 3 Mart. (O.S.) 296, 303 (La. 1814).The banks of navigable rivers are private things subject to public use. La. CC Art. 456. Ordinarily, the bank belongs to the riparian landowner. See Comment (b) to La. CC Art. 456. The bank of a river is defined as the land lying between the low water stage of the river and the high water stage. La. CC Art 456. However, where there is a levee in proximity to the water, the levee is the bank. Id.

When Louisiana was admitted to the Union, it received title to all lands of navigable rivers,

including the Mississippi River, below the then high water mark. Pollard v. Hagan, 44 U. S. 212

(1845); State v. Placid Oil Co., 300 So.2d 154 (La., 1974). The state has the right, therefore, to fix

titles and boundaries as to riparian owners. Pollard, supra; Placid Oil, supra.

The banks of a river are defined by Louisiana law as the land lying between the ordinary low

stage and the ordinary high stage of the water. CC Art. 456. The high water stage is determined by

calculating the mean annual high of the river, rather than observing physical markings. DeSambourg

v. Board of Commissioners, et al, 608 So.2d 1100 (La. 4th C. 1992).[15] It is the highest stage that the

river usually reaches at any season of the year. Wemple v. Eastham, 90 So. 637 (1922). Under

Louisiana law, the bed is the land covered by water at the river's ordinary low stage. Id.[16]

Private ownership of the banks of a navigable river in Louisiana "is not inconsistent with the

navigability of the body or stream. Nor is navigability affected by such ownership; such ownership

and the full enjoyment thereof may be somewhat impaired by reason of the superior rights of the

Government and the public to the unhampered use of the water above them for navigation,

commerce or fishing." D'Albora v. Garcia, 144 So. 2d 911 (La. App. 4th C. 1962). This impairment

of the landowner's rights is not substantially different from that occurring where the Federal

navigational servitude is present. See Rands, 88 S. Ct. at 266; Lambert, 835 F. 2d at 1111. Those

acquiring riparian rights in Louisiana take their lands subject to the rights of public use set forth in

La. C.C. Art. 456 and those applicable to the waters themselves recognized in D'Albora and in La.

---

[15] In this regard, the definition of high water differs from the Federal law. See discussion, p. 12-13.

[16] Federal law considers the term bed to include the bank, that is to include the land up to the ordinary high water mark, a term defined by Federal law and which differs from the state law definition of high water mark. See as to bed, Rands, 88 S. Ct. at 266; United States v. Kansas City Life Ins. Co., 70 S. Ct. 855 (1950); United States v. Willow River Power Co., 65 S. Ct. 761 (1945).

C.C. Arts. 450 and 452. "The riparian owner may use the running water for his purposes, but he may not interfere with, nor prevent its use by the general public." La. C.C. Arts. 657 and 658; Yiannopoulos, 2 La. Civ. Law Treatise §36, 99 *et seq.* (2d ed. 1980). "Therefore, the possessor of the bed, or owner for that matter, may not fence or enclose the 'land' so as to impede the use of the flowing water." Chaney v. State Mineral Board, 444 So.2d 105, 108 (La 1983). The same holds true as to the bank of the river. See La. CC Art. 450.

The Louisiana Civil Code clearly grants to the public the right to use the State's "running waters" and "waters" of natural, navigable rivers. La. CC Art. 450, 452. Those waters remain public regardless of their stage, that is whether they are at low water mark, high water mark or somewhere in between.

ii) "Everyone has the right to fish in the rivers. . . ."[17]

The Louisiana Supreme Court has recognized that "[t]he public has a traditional right to fish from boats in the navigable waters of the state." State v. Barras, 615 So.2d 285 (La. 1993). In Barras, the Louisiana Supreme Court considered the case of two commercial crawfishermen who were convicted of trespass in violation of La. R.S. 14:63.3, for remaining on property belonging to another after being forbidden. The two men had only been seen on the property, which was near the Atchafalaya River, in boats. At least one of the two was seen entering a canal on the property and fishing in a "slew". The Supreme Court noted that "the public has a traditional right to fish from boats in the navigable waters of the state" and cited La. CC Art. 452, Yiannopoulos, supra, §58, and 33 U.S.C. § 10. The trial court found that, although the area where the two men were fishing was inside the levees, it was not on the banks. The court of appeal stated that the property was part of the

---

[17] La. CC Art. 452

17

Atchafalaya River's flood plains. The Supreme Court found that the record supported both conclusions and found it determinative that the two defendants were crawfishing on "flooded swamp land," not on the banks of a navigable stream or in navigable waters. Justice Dennis (now Circuit Judge) dissented, pointing out that the state had failed to prove that the area was not part of the bank of the river and thus subject to public use.

Barras is instructive in that it, like La. CC Art 452, recognizes the public's right to fish[18] from boats in the navigable waters of the state.

Barras is also important in another respect: The court held "[t]he Barras brothers were crawfishing on flooded swamp land, not on the submerged banks of a navigable stream or in navigable waters." Therefore, the decision turned on whether the defendants were or were not fishing within the banks of the river, that is, fishing on waters between the ordinary low water mark and ordinary high water mark of the river. Barras, like the instant case, also involved other bodies of water located on the area argued to be banks.

The sheriff argues that this court should adopt the position that "lands occasionally flooded by navigable streams or rivers may be subject to a navigational servitude, but the purposes of this servitude do not include hunting or fishing on waters temporarily covering private property." In support, the sheriff cites Edmiston v. Wood, 566 So.2d 673 (La. App. 2nd Cir. 1990) for the proposition that private land does not become subject to unlimited public use when backwaters flood it. Edmiston is easily distinguished. In Edmiston, plaintiffs argued that, when they duck hunted in a boat on waters near the Mississippi River, they were simply making use of the navigable body of water. The court found, however, that the waters on which they hunted were not over the banks of

---

[18] Fish are the property of the state. La. R.S. 56:3.

the river but were on waters <u>above</u> the ordinary high stage of water and, therefore, they were not subject to public use of any kind.

Defendant also cites <u>Warner v. Clarke</u>, 232 So.2d 99 (La. App. 2nd C. 1970).[19] However, <u>Warner</u> is distinguishable because it involved plaintiffs who wanted to go upon riparian land to hunt and fish. It did not involve persons seeking to use only the waters of the Mississippi.

Walker Lands cites <u>Buckskin Hunting Club v. Bayard</u>, 868 So.2d 266 (La. App. 3rd C. 2004) in support of its argument that the Walker lands are not subject to public use. The case involved the plaintiff's request for an injunction to prohibit hunters from entering property in the Atchafalaya basin which it leased for its hunting club. While it is difficult to determine from the court's opinion whether the alleged trespassers there were found on land or water, it appears that most likely they used both. The court correctly ruled that the dry banks of a navigable river may not be used by the public for hunting. It also ruled that the man-made private canals located on the property could not be used. The court also found that there was a difference between the banks of a navigable river and its flood plains, presumably finding that the lands at issue were not within the banks of the river as defined by Louisiana law. The Buckskin case is consistent with the reasoning and analysis here: the public has a right to use the waters of a navigable river within its banks, that is, up to its high water mark, but has no right to use waters beyond the bank nor to use the dry bank for hunting.[20]

---

[19] Coincidentally, <u>Warner</u> also concerned lands located in East Carroll Parish.

[20] Walker Lands also spends much time in its brief arguing that this court must treat the issues in the Louisiana Second Circuit proceedings as res judicata and not allow re-litigation of issues determined there. I agree. The Second Circuit affirmed the trial court's determination as to the manner in which Gassoway lake was created and its ownership in Walker Lands, and that Gassoway lake and the drainage ditch were not navigable. Although the trial court enjoined the public from access to the property and waters based on its determination that no servitudes or other rights to enter the property existed, the court of appeal reversed that part of the judgment and refused to enjoin the public or the State. It found no justiciable controversy between the State

Finally, La. R.S. 56:640.3 recognizes Louisiana's public policy "that all citizens of the state have a right to fish in and otherwise enjoy marine waters as long as they are in compliance with current licensing requirements." The statute further "recognizes continued public access to fishing opportunities in marine waters." Although the statute applies to marine waters, it evidences Louisiana's strong public policy regarding citizens' rights to fish in public waters.

Based on the foregoing, I find that the public has the right under Louisiana law to use the waters of this navigable river, the Mississippi, up to the ordinary high water stage (as defined by Louisiana law) which is 112 feet as found by the Louisiana Second Circuit. The public uses must be reasonable[21] but, like the federally recognized rights to use navigable waters discussed above must include, at the very least, those traditional uses of navigation (including travel and transportation), commerce, boating, sailing, and fishing and hunting from boats.[22]

The right to use the river's waters includes the right to use the entirety of the waters, regardless the river's level or stage or how much of its bank it covers. It is nonsensical to suggest that persons may use that portion of the water covering the bed and a part of the bank when the water is

---

and Walker Lands and specifically "pretermit[ted] discussion of the available use of these legal public servitudes during times of high water." The issues before this court were not decided by the Second Circuit and thus have not been re-litigated. It is therefore not necessary to determine the extent to which res judicata, including claim preclusion (res judicata) or collateral estoppel (issue preclusion) might otherwise apply. See Petro-Hunt, L.L.C. v. United States, 365 F3d 385 (5th Cir. 2004). However, I note that the parties are not the same nor are they in privity. Although Walker Lands argues that the plaintiffs here and the State in the state court proceeding are in privity, the fact is that the very reason the Second Circuit refused to enjoin the State or the public and pretermitted a ruling on the applicability of legal servitudes during times of high water was because it found that the State (unlike the plaintiffs here) had not attempted to go upon the property or seek access to it.

[21] Phillips Petroleum Company, 484 U.S. 469, 108 S. Ct. 791, 797 (1988).

[22] See, as to hunting migratory birds from a boat, 50 C.F.R. §20.21.

at its usual or normal stage, somewhere between low and high water stage, but cannot use the waters when they rise to cover any additional portion of the bank. Were the law to adopt such a rule, an unreasonable and, indeed, impossible burden would be placed on the public to ascertain, at any given point in time, just where on the surface of the water the boundary between the bed and the bank lay at any given point along the river even at normal or usual stages of the river. The purpose of the law having recognized the bank as a private thing subject to public use is for the very reason that flowing rivers rise and fall with the seasons and the weather.

Neither does the fact that, at certain river stages, there may be visible on the bank lakes, bayous, ditches or other non-navigable water bodies or even privately owned man-made structures change the fact that the river may be used to its full extent–that is, even when it covers, in part or full, its banks and anything on them.

Walker Lands argues in its amicus brief that "[s]loughs, creeks, ditches, etc. that connect with navigable streams are not thereby made navigable if not used as highways of commerce and the navigation servitude is not applicable even if navigable waters back up into them", citing Zunamon, supra. However, plaintiffs' rights do not depend on the navigability of the ditches and other water bodies lying within the banks of the river, but rather devolve from the fact that the Mississippi itself is a navigable river and remains so to the high water mark regardless its water stage.[23] The river's character as a navigable river and the public's rights to use it do not change by the fact that, in rising, it may cover land, structures or other water bodies lying within its own banks.

In this case, plaintiffs have a right, under Louisiana law, to use the waters up to the high water stage as found by the Second Circuit of 112 feet. Although at that stage the Mississippi

---

[23] Zunamon denied summary judgment because the court could not determine whether the property was within the high water mark of the river or not.

River's waters will, according to the topographic map, be at or against the levee, I do not find that the levee defines the bank in this case because it is not in proximity to the river (La. CC Art. 456), but is over 3 ½ miles away; rather the high water mark defines the upper limits of the bank in this case. In this case, however, it just so happens that the high water mark is at or against the levee.

Finally, the rights recognized herein are not predicated on any public right to use the banks of the river (which rights are limited-see CC Art. 456; La. Op. Att'y Gen. 96-257) but rather on the public's right to use the waters of the river itself even when it covers those banks in whole or in part.

Riparian owners and their predecessors in title, who chose to purchase riparian property, are charged with holding it subject to the rights of the public to use the river's waters as provided by Louisiana and Federal laws and subject to the rights of the Federal and State governments to regulate their use. Walker lands argues that it and its predecessors in title have owned the subject property in private ownership for a hundred and seventy years and that it has a right to limit access to it. What Walker Lands fails to acknowledge, however, is that its riparian land lies within the bank of the Mississippi river, a navigable river, and it and its predecessors in title chose to purchase the property subject to various rights in the Federal government, the State government, and the public, including regulation for purposes of interstate and foreign commerce, navigation (including the Federal navigational servitude), national defense, certain limited rights under State law to use the banks and the public's rights to use the waters of the river.

The Civil Rights Act and Probable Cause

In the complaint filed December 17, 2001, and verified[24] by each plaintiff, plaintiffs seek

---

[24] A verified complaint made on personal knowledge is competent summary judgment evidence. Hart v. Hairston, 343 F.3d 762, 764 (5th Cir. 2003); 28 U.S.C. 1746. See, as to personal knowledge, Huckabay v. Moore, 142 F.3d 233, 240 (5th Cir. 1988).

damages for violation of their civil rights on account of their arrests. Each plaintiff alleges that he has been arrested on at least one occasion by the defendant sheriff.[25] Further, plaintiffs Roberts, Balch, and Watts have each filed affidavits as to the fact of their arrests. However, the dates of the arrests were not set forth.[26] By supplemental chronology, Document # 76, consented to by opposing counsel, plaintiff Gammill states that he was first arrested in 1996. Watts was arrested in 1997 and Rogers and Watts in 1999. Parm was arrested in 1999 and Balch in 1999.[27]

The sheriff is sued only in his official capacity. Official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent. Monell v. New York City Dept. of Social Services, 436 U.S. 658, 98 S. Ct. 2018, 2035 n. 55 (1978). However, to be liable in one's official capacity under 42 U.S.C. § 1983, the defendant must have been delegated policy-making authority under state law. In essence, suing a party in his official capacity is duplicative of an action against the municipality for which the official serves as an agent. City of St. Louis v. Praprotnik, 485 U.S. 112, 125, 108 S.Ct. 915 (1988). Also, Turner v. Houma Mun. Fire and Police Civil Serv. Bd., 229 F.3d 478, 483 (5th Cir. 2000).

Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, the entity's policy or custom must have played a part in the violation of federal law. Hafer v. Melo, 502 U.S. 21, 25, 112 S.Ct. 358, 361-362 (1991). In contrast, personal-capacity suits which seek to impose individual liability upon a government officer for

---

[25] Sheriff Shumate became sheriff on May 11, 1998.

[26] Plaintiff Watts filed a supplemental affidavit on October 5, 2006 alleging that he was again arrested on April 26, 2005, over 3 years after this suit was filed. However, the complaint has not been amended to include a claim for damages for that arrest.

[27] Statute of limitations issues have not been raised.

actions taken under color of state law are recognized under Section 1983. Hafer, 502 U.S. at 25.

A state official can be sued in his individual capacity and be held personally liable under § 1983 if

it can be shown that the official, acting under color of state law, caused the deprivation of a federal

right. However, such persons are entitled to assert qualified immunity. Hafer, 502 U.S. at 25-31.

Also, while an award of damages against an official in his personal capacity can be executed

only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in

an official-capacity suit must look to the government entity itself. Turner, 229 F.3d at 483. An

official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.

Turner, 229 F.3d at 484.

La. R.S. 33:9001, et seq., empower the sheriff to raise revenues to finance his facilities and

services through the creation of a continuing legal entity in each parish known as a law enforcement

district, whose corporate existence survives the term of office of any individual sheriff.[28] Prator v.

---

[28] La.R.S. 33:9001 states:

"There is hereby created, in each parish except Orleans, a special district to be known as a law enforcement district for the purpose of providing financing to the office of sheriff for that parish. In the parish of Orleans such a special district is hereby created for the purpose of providing financing to the office of criminal sheriff. The provisions of R.S. 33:9002, 9003(D), 9007, 9008, and 9010 shall apply to the district created in the parish of Orleans. No other provisions of this Chapter shall be applicable thereto. The boundaries of each district shall be coterminous with the boundaries of the parish and the duly elected sheriff of the parish or in the parish of Orleans, the criminal sheriff or his successor shall be ex officio the chief executive officer of the district."

Law Enforcement Districts were discussed in City of Shreveport v. Caddo Parish, 27,519 (La.App. 2 Cir. 6/23/95), 658 So.2d 786, 794-795:

"The law enforcement districts were created in 1976 to provide financing to the office of the sheriff in each parish. ...Over time the powers of the law enforcement districts have been expanded to grant the sheriff the ability to raise funds related to jails. In 1988, LSA-R.S. 33:1422 was amended to add the following section:

"D. Notwithstanding the provisions of R.S. 33:4713, a sheriff and ex officio tax collector may purchase and equip such real property as is necessary in the performance of his duties, including but not limited to an adequate and safe jail. The ownership of such real property shall be vested in the parish law enforcement district.

<u>Caddo Parish</u>, 38,085 (La. App. 2 Cir. 1/28/04), 865 So.2d 932, 936.

Therefore, a suit against Sheriff Shumate in his official capacity is actually a suit against the East Carroll Parish Law Enforcement District.

a) <u>Qualified Immunity</u>

Sheriff Shumate asserts the defense of qualified immunity. The defense of qualified immunity protects a public official from both litigation and liability, absent a showing that the official violated a constitutional right that was clearly established at the time of the incident. <u>Woods v. Smith</u>, 60 F.3d 1161, 1164 (5th Cir. 1995), cert. den., 516 U.S. 1084, 116 S.Ct. 800 (1996). Qualified immunity cloaks a police officer with immunity from personal liability for discretionary acts which do not violate well established law. Officers have qualified immunity if their actions could reasonably have been thought consistent with the right they are alleged to have violated. <u>Richardson v. Oldham</u>, 12 F.3d 1373, 1380-81 (5th Cir. 1994), and cases cited therein. Qualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful. <u>Hope v. Pelzer</u>, 536 U.S. 730, 122 S.Ct. 2508, 2515 (2002).

A § 1983 suit naming defendants in their "official capacity" does not involve personal liability to the individual defendant. The only immunities available to the defendant in an

---

"In 1989, LSA R.S. 33:9010 was amended to expand the law enforcement district's long-term borrowing powers to include the following provision:

"D. (1)(a) Each district is authorized to issue revenue bonds in order to obtain funds to acquire, construct, reconstruct, renovate, improve, replace, maintain, repair, extend, enlarge, lease, as lessee or lessor, purchase, or equip such immovable or movable property, including but not limited to jails, administration or office buildings, maintenance, storage or utility facilities, or any other facility, building, structure, equipment, or furnishings which may be of use or benefit to the district or to the applicable sheriff.

"However, these provisions are entirely discretionary. They are not mandatory, as are the obligations imposed upon the parish. While the sheriff may have the option of resorting to these fund-raising methods to secure funds for jails--with the approval of the voters--there is no mechanism in these statutes which requires him to do so."

official-capacity action are those that the governmental entity possesses. Officials sued in their personal capacities may assert personal immunity defenses such as objectively reasonable reliance on existing law. Hafer v. Melo, 502 U.S. 21, 25, 112 S.Ct. 358, 362 (1991). However, qualified immunity attaches only to officials in their individual, not their official, capacities. Foley v. University of Houston System, 355 F.3d 333, 337 (5th Cir. 2003).

Neither the law enforcement district, nor Sheriff Shumate in his official capacity, are entitled to qualified immunity. Owen v. City of Independence, Mo., 445 U.S. 622, 650, 100 S.Ct. 1398, 1415 (1980); Foley, 355 F.3d at 337.

b) Official capacity

In Monell v. New York City Dept. of Social Services, 436 U.S. 658, 689, 98 S.Ct. 2018, 2035 (1978), the Supreme Court held that, since there is no respondeat superior liability under Section 1983, a municipality may not be held liable under Section 1983 solely because it employs a tortfeasor. In Board of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 403-404, 117 S.Ct. 1382, 1388 (1997), the Supreme Court further held that a plaintiff seeking to impose liability on a municipality under Section 1983 is required to identify a municipal "policy" or "custom" that caused the plaintiff's injury. Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. In Barrett v. Kocher, 127 Fed.Appx. 697, 2005 WL 752780 (5th Cir. April 4, 2005), the Fifth Circuit stated, "In narrow circumstances, even a single incident can establish an official policy 'where the facts giving rise to the violation are such that it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy or failure to train,'" quoting Burge v. St. Tammany Parish, 336 F.3d 363, 373 (5th Cir.2003), cert. denied, 540 U.S. 1108, 124 S.Ct. 1074, 157

L.Ed.2d 895 (2004).

State law guides the court's determination of identifying those officials whose decisions represent the official policy of the local government unit. Craig v. St. Martin Parish Sheriff, 861 F.Supp. 1290, 1301 (W.D. La. 1994), citing Jett v. Dallas Independent School Dist., 491 U.S. 701, 737, 109 S.Ct. 2702, 2724 (1989). Under Louisiana law, the sheriff is a final policymaker. Craig, 861 F.Supp. at 1301, citing La. Const. Art. 5, § 27 ("[The sheriff] shall be the chief law enforcement officer in the parish."); La.R.S. 33:1435 ("Each sheriff ... shall preserve the peace and apprehend public offenders.").

Plaintiffs allege that they were arrested for criminal trespass pursuant to La. R. S. 14:63[29] for being on navigable waters covering the Walker land.

The statute, La. R.S. 14:63, provides, in pertinent part:

"No person shall enter upon immovable property owned by another without express, legal, or implied authorization."

A police officer may arrest a person if he has probable cause to believe that person committed a crime. Tennessee v. Garner, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699 (1985); La. C.Cr.P. art. 213. The constitutional torts of false arrest, unreasonable seizure, and false imprisonment require a showing that there was no probable cause. Brown v. Lyford, 243 F.3d 185, 189 (5th Cir.), cert. den., 534 U.S. 817, 122 S.Ct. 46 (2001). Probable cause justifying an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about

---

[29] The complaint erroneously refers to La. R. S. 14: 67, Theft. In brief, plaintiffs refer to La. R.S. 14: 63. However, there also exists another trespass statute: La. R.S. 14: 63.3. In brief, plaintiffs also argue the applicability of La. R.S. 14:63.12; however, that statute was repealed in 2003, after plaintiffs' brief was filed in 2002.

to commit an offense. <u>Michigan v. DeFillippo</u>, 443 U.S. 31, 37, 99 S.Ct. 2627 (1979); <u>Gladden v. Roach</u>, 864 F.2d 1196, 1199 (5th Cir.), cert. den., 491 U.S. 907, 109 S.Ct. 3192 (1989). Louisiana courts have explained it thus:

> "Probable cause to arrest exists when facts and circumstances within the arresting officer's knowledge and of which he has reasonable and trustworthy information are sufficient to justify a man of average caution in the belief that the person to be arrested has committed or is committing an offense. Although mere suspicion cannot justify an arrest, the officer does not need sufficient proof to convict. Probable cause must be judged by the probabilities and practical considerations of everyday life on which average men, and particularly average police officers, can be expected to act."

<u>Brown v. Rougon</u>, 552 So.2d 1052, 1056 (La. App. 1st Cir. 1989), writ den., 559 So.2d 121 (La. 1990), and cases cited therein.

There is scant evidence before the court as to the circumstances of plaintiffs' arrests. The verified complaint states that each plaintiff has been arrested "by the Defendant" (sheriff), but does not state whether that is literally true or whether the sheriff acted through his deputies.

In either event, the sheriff did not have probable cause to arrest the plaintiffs because the sheriff should have known that the plaintiffs were legally authorized to be upon the waters. La. R.S. 14:63. The sheriff was required to know that the Mississippi River is a navigable river and that federal and state law, as discussed in detail above, has long recognized that the public has a right to use those waters to their full extent.[30]

---

[30] Plaintiffs claim the sheriff knew the district attorney would not prosecute anyone arrested for being on the water over the Walker lands because he believed the law was unsettled as to whether that constituted a trespass. That fact, if true, would constitute additional evidence that the sheriff knew he did not have probable cause to arrest the plaintiffs for trespass. Compare, <u>Brown v. Rougon</u>, 552 So.2d 1052, 1056 (La. App. 1st Cir. 1989), writ den., 559 So.2d 121 (La. 1990) (sheriff correctly relied on advice from the district attorney and landowner, that the general public did not have the right to use the canal, in deciding there was probable cause to arrest trespassers). However, the Sheriff correctly notes that the letter from the district attorney saying he would not prosecute was dated April 22, 2002, long after the arrests complained of.

Further, because plaintiffs had been arrested more than once, they have proven a policy or custom on the part of the sheriff to make arrests for trespass on the Walker lands without probable cause whenever the Walkers asked him to do so. See sheriff's affidavit, Ex. D, Doc. #12.

There are no genuine issues of material fact. Because the arrests were without probable cause to believe an offense had been committed, the sheriff violated the 4th amendment rights of the plaintiffs and is answerable to them for any damages they have sustained. The extent of those damages must be determined by additional motion or trial.

Injunction

Plaintiffs seek an injunction against the sheriff enforcing the trespass laws with regard to them on the Walker lands. In brief, plaintiffs have advised the court that [one] laudable effect of this litigation has been the Sheriff's voluntary cessation of arresting people navigating on the waters in dispute in this matter. See Doc. #20 filed July 26, 2002. However, the supplemental affidavit filed by plaintiff Watts shows that the sheriff has at least arrested Watts since that time for trespass on these lands. See Doc. #50-2.

It would be improper for this court to enjoin Sheriff Shumate from enforcing the trespass laws with regard to the Walker lands. The Walkers are entitled to equal protection of the law; the sheriff must perform his job duties. Moreover, enjoining Sheriff Shumate from properly enforcing the trespass laws would not assist the plaintiffs in this matter, since the problem in this case has not been the proper enforcement of the trespass law, but rather arrests made without probable cause to believe the trespass law had been violated. Accordingly, plaintiff's request for injunctive relief, enjoining Sheriff Shumate from enforcing trespass laws over Walker lands, should be denied. Likewise, enjoining Sheriff Shumate from falsely arresting plaintiffs for being upon the water over Walker lands would also be inappropriate. If Sheriff Shumate persists in violating plaintiffs'

constitutional rights, their recourse is in this court.

State Law Claims for False Arrest/False Imprisonment

Louisiana state law recognizes the tort of false arrest. Alvarado v. Poche, 2002-2 (La. App. 3d Cir. 6/5/02), 819 So.2d 1150, 1152. In order for a plaintiff to recover for false arrest, he must prove that he was unlawfully detained by the police against his will. Thus, two elements are required to prove a case in false arrest and imprisonment: (1) detention of a person, and (2) unlawfulness of the detention. Dumas v. City of New Orleans, 2001-0448 (La.App. 4 Cir. 12/05/01), 803 So.2d 1001, 1003, writ den., 2002-0024 (La. 3/15/02) 811 So.2d 912, citing Harrison v. State Through Dept. of Public Safety and Corrections, 97-1086 (La. 12/1/98), 721 So.2d 458, 461; Hughes v. Gulf International, 593 So.2d 776, 780 (La. App. 4th Cir. 1992), writ den., 595 So.2d 658 (La. 1992). As discussed at length above, the sheriff arrested the plaintiffs, or authorized their arrest, without probable cause to believe a crime had been committed. Therefore, Sheriff Shumate should be held liable to plaintiffs under state law, as well, for any damages plaintiffs prove.

## CONCLUSION

For the foregoing reasons, IT IS RECOMMENDED that:

1) Plaintiffs' motion for summary judgment (Doc. #5) be GRANTED and defendant's motion (Doc. #11) be DENIED and that JUDGMENT be entered DECLARING that, under federal and state law, plaintiffs are entitled to reasonably use the waters of the Mississippi from the ordinary low water mark to the high water mark as defined by Federal and State law which use includes at the least, the purposes of navigation (including travel and transportation), commerce, boating, sailing, and fishing and hunting from boats;

2) Plaintiffs' request for injunctive relief be DENIED.

3) JUDGMENT be entered in favor of plaintiffs and against the sheriff, finding the arrests

of the plaintiffs were without probable cause, in violation of both 42 U.S.C. §1983 and state law.

4) Further proceedings be held to ascertain the extent of plaintiffs' damages resulting from their illegal arrests.

## OBJECTIONS

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the clerk of court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the district judge at the time of filing. Timely objections will be considered by the district judge before he makes his final ruling.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT UPON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UN-OBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, in Alexandria, Louisiana, on this the 21st day of April, 2006.

JAMES D. KIRK
United States Magistrate Judge



EXHIBIT A

32